IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KAMEHAMEHA KANE, #A0702233, | ) ) ) | CIV. NO. 06-00055 JMS-KSC |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART |
| vs. | ) ) | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| STATE OF HAWAII, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pro se Plaintiff Kamehameha Kane alleges that Defendants Gary Saldana and Ida Perez (collectively, "Defendants") violated the Eighth Amendment by their deliberate indifference to his serious medical needs. Kane further alleges that Defendants' actions violated state law.

Defendants seek summary judgment on all counts of the Complaint under Federal Rule of Civil Procedure 56. For the following reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.

# I. **BACKGROUND**

## A.    **Procedural Background**

On January 30, 2006, Kane filed this prisoner civil rights action alleging claims under 42 U.S.C. § 1983 and Hawaii state law.  Kane named the State of Hawaii, Kulani Correctional Facility ("Kulani") physician Gary Saldana ("Dr. Saldana"), Kulani nurse Ida Perez ("Perez"), and numerous Doe Defendants, as defendants to this action.

Kane claims that Dr. Saldana diagnosed him with a chronic neck injury and placed him on workline restriction.  Kane alleges that despite this restriction, Perez ordered him to report to the Kulani landscaping workline on March 12, 2004.  Kane says that this caused him "severe pain and suffering." Compl. ¶¶ 13-16.

Kane filed a grievance over this incident, and alleges that, because he did so, Perez "terroristically threatened" him.  He claims that, rather than providing him with medical care for his pain, Perez told him that if he failed to withdraw the grievance, she would have him transferred to Halawa Correctional Facility ("HCF").   Kane further alleges that Defendants have denied his repeated requests for an examination by an orthopedic specialist and physical therapy, and have "not . . . provided [him] with any further proper adequate and appropriate

2

medical evaluation nor medical treatment and care to his neck, shoulder or back as of the date of the filing of this complaint."  Compl. 8.

Kane alleges that Defendants' actions violated the Eighth Amendment as well as various state laws.  He seeks compensatory and special damages, court costs, and "pre-and-post judgment interest."  Compl. 13-14, Prayer for Relief.

On April 17, 2006, the court dismissed the State of Hawaii and all other claims for damages against Defendants in their official capacities.  Doc. No. 24.  Claims against Dr. Saldana and Perez in their individual capacities remain at issue.[1]

## B.   Factual Background

The undisputed facts underpinning this case are as follows.  Since at least 1999, Kane has been placed intermittently on and off prison workline restrictions.[2]  *See* Def. Ex. A., P0039, P0040, P0041.  Since at least May 31, 2002, Kane has complained of, and been treated for, neck and back pain.  *See e.g.*, Def. Ex. A, P0642, P0422, P0638, P0639, P0641, P0644, P0645, P0647.  This injury

---

[1]  Although trial is less than one month away, and the date for adding parties is long past, Kane has never moved to name or identify any Doe Defendant.

[2]  These restrictions occurred while Kane was incarcerated at Halawa Correctional Facility ("HCF"), on the Mainland, and at Kulani.

apparently stemmed from Kane's fall from a top bunk bed. *Id.* P0422, 5/31/02

entry ("Fell off top bunk today").[3] Kane thereafter complained intermittently of

neck and back pain, often threatening to sue prison officials. *Id.* Since then, Kane

has been treated intermittently for neck and back pain with various medications

and examinations. *See generally* Def. Ex. A. In November 2002, while he was

still on the Mainland, Kane's records note that he should use a soft neck brace

while working. *Id.* P0422. Although it is not clear when or if the neck brace was

given to Kane, the records show that Kane apparently received and lost a *back*

brace on or before December 26, 2003. *Id.* P0647. Despite this ongoing

treatment for neck and back pain, Kane was not placed on any workline restriction

following his transfer from the Mainland back to Hawaii in 2003. *Id.* P0001.

     The events at issue here occurred while Kane was incarcerated at

Kulani, which is a prison work facility. *Id.* P0637, Ex. B, Perez Dec. On

December 26, 2003, Kane reported to the prison health clinic complaining of neck

pain. Def. Ex. A, P0647. Kane's medical records for this date indicate that he had

injured his neck two years before, when he fell from a top bunk. *Id.* Kane did not,

---

[3] It is unclear what Defs.' Ex. P0422 represents. Although it is part of Kane's
institutional records, this does not appear to be a medical record. There is no notation as to who
wrote the entries on this paper, what purpose this record serves, or why the dates are not set forth
chronologically. Kane has not, however, disputed the veracity of this exhibit.

at that time, report that his neck was injured on the prison landscaping workline.

Kane was given pain medication, including Flexeril 10 mg., and Motrin 800 mg.

*Id.*

On January 13, 2004, Dr. Saldana saw Kane for a follow-up visit. *Id.*

P0644. Dr. Saldana noted Kane's "spastic cervical and upper back muscles," and

ordered, *inter alia*, a three-to-five day workline restriction, rest, hot showers, and

analgesic balm. *Id.* Dr. Saldana requested a follow-up within two to four weeks.

On January 21, 2004, Kane's medical reports indicate that an "MRF"

was received, and that Kane reported continued neck pain.[4] *Id.* P0645. On

January 27, 2004, Kane's medical records note that Kane claimed he had hurt his

neck carrying a water pipeline while on the prison landscaping workline, although

he continued working for three more days before it began to hurt. *Id.*; *see also*

P0741. The records note that Kane made no earlier verbal report of this injury. In

response to the MRF, Nurse Sarah Linfoot placed Kane on workline restriction

"until further notice." *Id.* P0741.

On January 28, 2004, Kane was sent to Hawaii Radiologic Associates

for a clinical diagnosis or information regarding neck pain and "DJD." Compl.

---

[4] In his Complaint, Kane mentions filing a medical request form; the court assumes that "MRF," is an acronym for this form.

Ex. B, Report.  The radiologist, Michael Seu, M.D., reported that Kane had "Degenerative disc disease C5-6 and C6-7," and "osteophytes with encroachment upon the C6-7 neural formina bilaterally."  *Id.*  Nurse Sarah Linfoot and Dr. Saldana initialed receipt of this report, respectively, on February 4 and 10, 2004.

On February 10, 2004, Dr. Saldana saw Kane for follow-up after the radiologic exam.  *Id.*, "Multidisiplinary Progress Notes."  Dr. Saldana noted "significant c-spine DJD [?] C5-6 & C6-7 - neuroforaminal encroachment[,] chronic mod-severe localized process, may need eval by orthopedics and/or physical therapy (traction [] ROM, etc) [ ] positive, biomechanical & gentle stretching program."  *Id.*  Dr. Saldana also reviewed and signed off on Linfoot's January 27, 2004, assessment of Kane's injury and his placement on indefinite workline restriction.  *Id.*  P0741.

On February 25, 2004, Dr. Saldana saw Kane again.  *Id.*  P0641. Saldana noted that Kane was "currently not working," and that there was "mod. improvement in neck."  *Id.*  The record indicates that Kane should return to the medical clinic in one month.  Although there is no mention in this record that Kane's work restriction was continued, there is also no mention that the "until further notice" restriction was rescinded.

On March 10, 2004, Kane was seen at the medical clinic for

6

medication renewal.  *Id.*  There is no mention on this date of either Kane's neck injury, or of the continuation or recision of his restricted workline status.

On March 12, 2004, after observing Kane "milling around the facility[,]" Perez admits that she ordered him to go to work.[5]  Def. Ex. B, Perez Decl.  Although Perez states that "Mr. Kane did not appear to be injured or impaired so I told him to go to work," Kane's medical records do not indicate that Perez, or any other prison medical personnel actually examined Kane on that date, pronounced him able to return to work, and rescinded the January 27, 2004 workline "until further notice" restriction put in place by Linfoot and approved by Dr. Saldana.  Perez Decl. ¶ 4; *see also* Def. Ex. A, P0641.

On the same day that Kane was allegedly injured, he submitted a

---

[5]  In his Oppositions, Kane belabors his argument that Perez initially denied sending him to work on this date, presumably referring to the denials in her Answer.  He also asserts that Perez did not personally tell him to go to work, that the order came from an Adult Correctional Officer acting on her behalf, that there is no notation in his medical records that Perez told him to go to work, and that, therefore Perez is lying.  *See* Pl. Decl. in Support of Response to Defs.' Mot. for Summ. J., dated June 5, 2007, at 6- 8.  Contrary to this assertion, in the grievance Kane submitted the day of the alleged incident, he states, "On 3-13-04 at about 8:15 am at ("KCF") medical unit *I was ordered by Nurse Ida* to go to work[.]"  Compl. Ex. C-1 (emphasis added).  Based on this and Perez's own admission that she is responsible for sending Kane to work on March 12, 2003, there is no genuine issue of material fact on this issue.

Kane also devotes a good portion of his Oppositions to his assertion that he was, in fact, sent to work on March 12, 2004, and was paid for that work.  *See* Pl. Resp. to Defs. Summ. J., dated June 4, 2007, 2-3; Pl. Decl. in Supp. of Resp. to Defs.' Mot. for Summ. J., dated June 5, 2007, 2-5; Pl. Decl. in Opp'n, dated June 6, 2007, 2-4.  As noted, Defendants explicitly admit that Kane was sent to work on March 12, 2004, and there is no genuine issue of material fact on this issue.

grievance over the incident.[6]  Compl. Ex. C-1.  Kane alleged that, after Perez

ordered him to work on the landscaping workline, he "suffered head, neck,

shoulder, and back pain and suffering, for approximately 3 hours."  Compl. Ex. C-

1.

Kane says that he was called to the Kulani medical unit on Monday,

March 15, 2004.  Compl. 6 ¶ 18.  He alleges that Perez then "terroristically

threatened" him for filing a grievance over the incident.  Kane claims that Perez

told him that, "if you don't take back this grievance I will write you up and ship

you back to Halawa."  *Id.* ¶ 20.  Whether Kane was seen at the medical unit on

March 15 is disputed, as Kane's medical records show that he saw Perez at the

medical unit on March 17, 2004.  Def. Ex. A, P0641, P0638.  Kane provides

nothing, other than his own allegations, to conclusively refute this date, and

Defendants do not address the discrepancy.  While Perez admits that she

"questioned" Kane about the grievance, she denies threatening him.  Def. Ex. B.

---

[6] Kane also argues that Perez and her attorney lied regarding the date that he filed his grievance, because they state that the grievance was filed on March 13, 2004, not March 12, 2004.  This misstatement is understandable, however; as noted above, Kane himself dated the grievance "3-13-04," and asserted in the grievance that "On 3-13-04 at about 8:15 am at ("KCF") medical unit I was ordered by Nurse Ida to go to work with the landscaping workline, Roy Kunishigi Supervisor."  Compl. Ex. C-1.  The incorrect date, therefore, originally came from Kane's recitation of events, not Defendants'.  There is no dispute over the date the grievance was filed, and in any event the exact date is not material to Kane's claims.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (stating that material facts are facts that might affect the outcome of the case; disputes over irrelevant or unnecessary facts should not be considered).

In Kane's medical chart for March 17, 2004, Perez notes that Kane had worked on the previous Friday, March 12, 2004, picking up trash for three hours. Kane complained that his feet had hurt him, due to cracked callouses, and that his neck also began to hurt that day "because of the way I was walking." Def. Ex. A, P0641. Perez scheduled him for a doctor's appointment on March 23, 2004. *Id.* P0641, P0638.

Kane reported to Dr. Saldana on March 23, 2004. *Id.* P0638. Kane was seen again on March 25 and 31, 2004. *Id.* P0638, P0639. On March 31, 2004, there is a notation removing Kane from the landscape workline. *Id.* P0639.

On April 6, 2004, Dr. Saldana noted, "[return to clinic] to discuss D.J.D. c-spine and possible transfer due to inability to perform workline, etc." *Id.* On April 29, 2004, there is another notation, stating "Discussed inmate[']s medical status [with] Dr. Bauman - IM not appropriate for Kulani workcamp facility --- P-Transfer to HCF- [signed] Sarah Linfoot RN." *Id.* P0637. Kane was continued on Flexeril and other medications during this time, and was seen regularly at the Kulani medical unit, for his neck pain as well as for other complaints, until his transfer to HCF on May 2, 2004. *Id.* P0639, P0636, P0637, P0633.

After his transfer to HCF, Kane continued to receive care for his neck and back pain. On May 9, 2004, there is a notation in his chart, stating that he

reported to sick call, complaining of neck pain, "trying to lift a pipe - Dec. 2003 - stated - states pulled shoulder & neck - now feels grinding in neck painful to move neck side to side." *Id.* P0633. Kane was given Ibuprofen, in addition to the Flexeril that was transferred with him from Kulani. *Id.* Kane was seen at the HCF medical unit in June, July, and August, although there is no mention of his neck or back pain during these visits. *Id.* P0631.

In October and November 2004, Kane began complaining of neck pain again. *Id.* P0631, P0632, P0629, P0630. He was treated for his symptoms and HCF Dr. Abbruzzese referred him for an orthopedic consult and MRI. *Id.* P0629, P0630. Kane received the MRI and orthopedic consult in January 2005. Reply. *Id.* PO629-30. Kane was seen several times in January, February and March 2005, although there is no record of complaints of, or evaluation for, neck or back pain. On April 6, 2005, Dr. Bauman discontinued Kane's Flexeril prescription. *Id.* P0628. Thereafter, Kane was seen numerous times at the medical clinic, or by medical personnel, in May, June, August, and December 2005, March, April, May, June, July, September, November, and December 2006, and in January, February, and March 2007, although there are no notations regarding complaints of neck or back pain or treatment for such pain during any of these visits. *Id.* P0628, P0004, P0005, P0002, P0003. On December 19, 2006,

Kane was approved for a MRI on his left ankle.  *Id.*  P0002.

## II. LEGAL STANDARD

Summary judgment shall be granted when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  *See id.* at 323.  In inmate cases, the courts must

> distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S. Ct. 2572, 2576 (2006).

A moving party without the ultimate burden of persuasion at trial --

usually, but not always, the defendant -- has both the initial burden of production

and the ultimate burden of persuasion on a motion for summary judgment. *Nissan*

*Fire & Marine Ins. Co. Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.

2000).  The moving party must identify for the court those "portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

626, 630 (9th Cir. 1987) (*citing Celotex Corp.*, 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its

opponent must do more than simply show that there is some metaphysical doubt as

to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely

on the mere allegations in the pleadings and instead "must set forth specific facts

showing that there is a genuine issue for trial."  *Porter*, 419 F.3d at 891 (*quoting*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  "A genuine dispute

arises if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *California v. Campbell*, 319 F.3d 1161, 1166 (9th Cir. 2003);

*Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of

fact' to find for plaintiffs in order to defeat the summary judgment motion.").

## III. <u>DISCUSSION</u>

Defendants argue that neither Perez nor Dr. Saldana were deliberately indifferent to Kane's medical needs, and that they are entitled to qualified immunity with respect to Kane's federal claims.  Defendants also assert that there is no civil cause of action for terroristic threatening, and that Kane has failed to adequately support his state law claims of negligence.

### A.    Section 1983 and Qualified Immunity

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

The Ninth Circuit employs a three-part test in determining whether state officials are entitled to qualified immunity.  *See Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006).[7]  The court must first answer a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [Defendants'] conduct violated a

---

[7] Other Ninth Circuit cases have applied a two-part test, conflating the second and third prongs of the test.  *See, e.g., Preschooler II v. Clark County Sch. Bd. of Trustees*, 479 F.3d 1175 (9th Cir. 2007); *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004).  Whether applying a two or three-part test, the court considers the same factors.

13

constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer is

no, qualified immunity applies to the conduct.  If the answer is yes, the court

proceeds to the second level of analysis.

 The second prong of the qualified immunity analysis determines

whether the right allegedly violated was "clearly established" at the time the state

official acted.  *Id.* at 201-02.  This analysis "must be undertaken in light of the

specific context of the case, not as a broad general proposition."  *Id.* at 201.  A

claim of a constitutional violation in a generalized sense is insufficient; instead,

"the right the official is alleged to have violated must have been 'clearly

established' in a more particularized, and hence more relevant, sense:  The

contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right."  *Anderson v. Creighton*, 483

U.S. 635, 640 (1987).  Thus, "[t]he relevant, dispositive inquiry in determining

whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted."  *Saucier,* 533

U.S. at 202.  If the answer to this question is no, qualified immunity applies to the

conduct.  If the answer is yes, the court turns to the third and final prong.

 The final question the court must ask is "whether the [Defendants]

could have believed, 'reasonably but mistakenly . . . that [their] conduct did not

violate a clearly established constitutional right.'"  *Skoog*, 469 F.3d at 1229

(*quoting Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)).  Thus,

the doctrine of qualified immunity "allows ample room for reasonable error on the

part of the official.  It encompasses both mistakes of fact and mistakes of law."

*Rudebusch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002) (citations, brackets, and

internal quotation signals omitted).  However, "qualified immunity will not protect

the plainly incompetent or those who knowingly violate the law."  *Preschooler II*

479 F.3d at 1180.

## B.    Kane's Deliberate Indifference Claims

The Government violates the Eighth Amendment if it fails to address

the medical needs of incarcerated individuals.  *Estelle v. Gamble*, 429 U.S. 97, 104

(1976); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the

unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment."

*Estelle*, 429 U.S. at 102.[8]  "A medical need is serious if the failure to treat the

prisoner's condition could result in further significant injury or the unnecessary

---

[8] For purposes of the Eighth Amendment, serious medical needs include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Lopez*, 203 F.3d at 1131.

and wanton infliction of pain." *Dickey v. Vargo*, 2004 WL 825624, at *2 (D. Or.

Feb. 27, 2004) (*citing McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992),

*overruled on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th

Cir. 1997) (further citations omitted)).  However,

> a complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state
> a valid claim of medical mistreatment under the Eighth
> Amendment.  Medical malpractice does not become a
> constitutional violation merely because the victim is a
> prisoner.  In order to state a cognizable claim, a prisoner
> must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical
> needs.  It is only such indifference that can offend
> "evolving standards of decency" in violation of the
> Eighth Amendment.

*Estelle*, 429 U.S. at 106; *accord Lopez*, 203 F.3d at 1131.

In deciding whether there has been deliberate indifference to Kane's

serious medical needs, this court is not required to defer to the judgment of prison

doctors or administrators.  *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir.

1989); *Nelson v. Locke*, 2005 WL 1030207, *6 (E.D. Wash. May 2, 2005).

Nonetheless, a "difference of opinion between a prisoner-patient and prison

medical authorities regarding treatment does not give rise to a § 1983 claim."

*Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981).

16

### 1.   *Claims for the Denial of Medical Care*

Kane makes blanket allegations that he "was denied proper, adequate, and appropriate medical care and treatment [, and was not] provided with any further proper adequate and appropriate medical evaluation nor medical treatment and care to his neck, shoulder or back *as of the date of the filing of this complaint*." Compl. 8 ¶ 26-27 (emphasis added). Although Kane names Dr. Saldana as well as Perez, he does not specifically address these allegations towards Dr. Saldana. He also points to no specific instances showing that Dr. Saldana, with deliberate indifference, intentionally denied or delayed his medical treatment.

After Kane allegedly reinjured his neck in December 2003, he was seen, treated, and given pain medication numerous times at the Kulani medical clinic. Dr. Saldana saw him on January 13, 2004, noted the back pain, ordered a workline restriction, and prescribed other treatments. Dr. Saldana sent Kane to Hawaii Radiologic Associates for diagnosis on January 28, 2004. Dr. Saldana then reviewed their report, and saw Kane for followup on February 10, 2004. He also approved Kane's placement on indefinite workline restriction. He saw Kane again on February 25, 2004, and instructed him to return to the clinic in a month. Kane returned on March 10, 2004, and his medication was renewed.

Between March 12, 2004, the date that Kane alleges he reinjured his neck, and May 3, 2004, the date he was transferred to HCF, Kane was seen regularly at the Kulani medical clinic.  His medical records show that he was seen by KCF medical personnel on March 17, 23, 25, 31, April 6, 8, 14, 20, 22, 28, 29, 30, and May 1, 2004.

Dr. Saldana examined him on March 23, 2004, and reiterated that Kane was removed from the workline.  Dr. Saldana also saw Kane on April 6, 2004, discussed his degenerative disc disease with him, and informed him of the possibility that he would be transferred from Kulani "due to inability to perform worklines etc."  Defs.' Ex. PO638.  As noted above, Kane was seen and treated many times at the Kulani clinic for his neck pain and other ailments numerous times after this date.

First, the court notes that Kane was transferred from Kulani on May 2, 2004.  At that point, the record indicates that neither Dr. Saldana nor Perez, who were employed at the Kulani facility, had any further involvement with Kane's medical care.  They cannot, therefore, be held accountable for Kane's allegations of the denial of medical care after that date.

Second, the record does not support an inference of deliberate indifference to Kane's serious medical needs.  Even if, as Kane argues, he wanted

18

an orthopedics evaluation or physical therapy, the medical need for this is not reflected in the record.  While Dr. Saldana noted the possibility of another orthopedics evaluation and therapy, his failure to proceed down this path does not indicate his deliberate indifference to Kane's serious medical needs.[9]  Dr. Saldana continued to treat Kane until his transfer to HCF, prescribing medications, rest, hot showers, etc.  That Dr. Saldana did not follow up on this particular type of treatment indicates at best, his medical decision to proceed with other courses of treatment first, and at worst, medical malpractice due to negligence, which is discussed more fully below.

This court does not second-guess a physician's decision to provide one type of treatment over another.  Kane provides no contrary evidence, expert or otherwise, showing that: (1) he required physical therapy or another orthopedic evaluation while Dr. Saldana was in charge of his care; or that (2) Dr. Saldana's course of treatment did not reflect the standard of care in the medical community for Kane's injury or was medically unacceptable under the circumstances.  *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (*citing Williams v. Vincent*, 508 F2d 541, 543-44 (2d Cir. 1974).  As such, all that is before the court is a

---

[9]  Moreover, the record establishes that, after his transfer to HCF, HCF Dr. Abbruzzese did refer Kane for another orthopedic consult and MRI.  Defs.' Ex. PO629-30.  Kane apparently underwent the procedure on January 28, 2005.  *See* Pl. Reply, dated June 4, 2007, at 6-7.

difference of opinion between Dr. Saldana and Kane regarding his treatment, which is clearly insufficient to state a ¶ 1983 claim.  *See Franklin*, 662 F.2d at 1344.

This analysis applies equally to Kane's claims against Perez for the denial of medical care, except insofar as he alleges that she was deliberately indifferent to his serious medical needs on March 12, 2004, when she ordered him to work.  Other than this date, which is discussed more fully below, the record establishes that Perez was only tangentially involved in Kane's medical care before and after his alleged injury on March 12, 2004.  After he reinjured his neck in December 2003, Perez saw Kane on January 1, 13, and 26, 2004.  Defs.' Ex. A, P0644-45.  After the March 12 incident, Perez saw Kane twice, on March 17, 2004, when they discussed the pain he was experiencing in his feet and neck, and she referred him for an appointment with Dr. Saldana, and again on March 25, 2004.  Defs.' Ex. A, P0641, P0638.  Other than these dates, Kane was seen by other nurses and Dr. Saldana, and there are no further entries on his medical records signed by Perez.

Kane has failed to establish a genuine issue of material fact as to the medical care he received for his neck pain while he was at the Kulani facility.  As such, Defendants are entitled to qualified immunity and summary judgment is

20

GRANTED as to Kane's claims against Dr, Saldana and Perez, for the delay or denial of medical care, except as to those claims against Perez that are discussed below.

### 2.    *Claims Against Perez Stemming From the March 12, 2004 Incident*

Kane asserts that Perez was deliberately indifferent to his serious medical needs when she ordered him to work on March 12, 2004, despite his neck and back pain, and documented workline restriction.  Perez counters that it was her opinion "that[,] as of March 12, 2004[,] Plaintiff was well enough to work." Mot. 11.

The records before this court show that Perez knew that Kane had been complaining about neck pain and had been seen at the medical clinic for this complaint.  It is unclear whether Perez also knew that Linfoot and Dr. Saldana had placed Kane on workline restriction.  There is nothing in the record detailing what Kane said or did upon being told he must report for work.  If, for instance, Kane protested and told Perez that he was on a workline restriction, and she ordered him to work anyway, this might suggest that she was deliberately indifferent to his medical needs.  If, on the other hand, Kane said nothing to Perez, or to his workline supervisor, this might compel a different conclusion.  Kane does not argue that he informed her, or anyone else, about this important information before

he reported to the landscaping workline.

Nor do the records indicate that the "until further notice" workline restriction, placed on Kane by Nurse Linfoot on January 27, 2004, and approved by Dr. Saldana on February 10, 2004, was ever rescinded.  In fact, the next time Dr. Saldana examined Kane, on February 25, 2004, approximately two weeks before Perez ordered Kane back to work, Dr. Saldana noted that Kane was "currently not working."  Defs.' Ex. A,  P0641.  Dr. Saldana did not explicitly rescind the workline restriction at this appointment.  Kane was given copies of this record on March 3, 2004, and therefore he likely believed that he was still on workline restriction.  Two days before the incident, on March 10, 2004, Kane was seen at the medical clinic, his medications were renewed, and again, there is no notation that the workline restriction had been removed, by either Dr. Saldana or any other Kulani medical personnel.

Moreover, despite Perez's assertion that, in her opinion, Kane "was well enough to work," there is nothing in the medical records showing that Perez actually examined Kane, and medically determined that he was able to work on March 12, 2004.  Mot. 11.  Perez admits that she simply noticed Kane "milling about," and decided that he should return to work.

Deliberate indifference may be manifested by prison staff

22

intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed.  *Estelle*, 429 U.S. at 104-05. Defendants provide nothing showing that Perez was unaware of Kane's workline restriction, or that the workline restriction had been rescinded or was limited to a certain time period, or that Perez actually examined Kane and medically determined he was fit for work, or that Perez had the authority to orally rescind the restriction and send Kane to work.  It does not appear that Perez even consulted Kane's medical chart before she ordered him to work.

It is impossible to say whether Perez's order amounted to deliberate indifference to Kane's medical condition, and thus, a constitutional violation, or only simple or gross negligence, or a mistake of fact.  As the record exists, however, there is a genuine issue of material fact concerning the circumstances surrounding Perez's order to Kane to report to work.  Assuming arguendo that there was a constitutional violation, and because the law governing medical care to inmates was clearly established, the court cannot determine, on the sparse record here, whether a prudent nurse at a prison work camp would have reasonably yet erroneously believed that ordering Kane to work was appropriate.  Taking the facts presented in the light most favorable to Kane, this Court finds that a genuine issue of material fact remains regarding Perez's motivation for and authority to

23

order Kane to work precluding qualified immunity.  Summary judgment is

DENIED as to this claim.

### 3.    *Threats of Retaliation Claim*

Kane claims that, after he filed a grievance against Perez for ordering

him to work, she threatened him with a transfer back to HCF unless he rescinded

his grievance.  Perez admits that she spoke to Kane about his grievance but denies

that she threatened him and claims that she does not have the authority to transfer

him to another facility.

Taking Kane's allegation in the light most favorable to him, the court

accepts that Perez did, in fact, threaten Kane with transfer for filing his grievance.

"A mere threat may not state a cause of action" under the Eighth Amendment.

*Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (per curiam) ("it trivializes the

eighth amendment to believe a threat constitutes a constitutional wrong");

*Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir.1987) (verbal harassment or

abuse by itself is not a constitutional deprivation).

Kane, however, alleges that Perez's threats were made in retaliation

for filing a grievance.  Retaliatory actions taken against a prisoner for exercising

his First Amendment rights violate the constitution whether or not the underlying

misconduct would establish a constitutional violation.  *See Rhodes v. Robinson*,

24

408 F.3d 559, 567 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267

(9th Cir. 1997) (holding that a prisoner may not be retaliated against for use of

grievance system); *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995) (same).  A

prisoner may not be penalized for the contents of a grievance.  *See Bradley*, 64

F.3d at 1279.  Because harm that is more than minimal will always have a chilling

effect, an inmate need not expressly allege a chilling effect to have a viable claim

of First Amendment retaliation.  *Rhodes*, 408 F.3d at 567 n.11; *Valandingham v.*

*Bojorquez,* 866 F.2d 1135, 1138 (9th Cir. 1989).  A chilling effect on a prisoner's

constitutional right to file grievances is sufficient to raise a retaliation claim

against prison officials.  *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003).

  In order to prevail on a § 1983 retaliation claim, Kane must establish

that he was actually retaliated against for exercising a constitutional right, and that

the retaliatory action was not related to a legitimate penological purpose, such as

preserving institutional security.  *See Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th

Cir. 1994) (per curiam).  A viable retaliation claim contains five elements: (1) an

assertion that a state actor took some adverse action against an inmate (2) because

of that prisoner's protected conduct and (3) that such action (4) chilled the

inmate's exercise of his First Amendment rights (or that the inmate suffered more

than minimal harm) and (5) was not narrowly tailored to advance a legitimate

correctional goal.  *Rhodes*, 408 F.3d at 567-68; *see also Hines*, 108 F.3d at 267.

Kane was placed on workline restriction in December 2003 and that restriction was never removed while he remained at Kulani.  Dr. Saldana spoke with Kane on April 6, 2004, and discussed the possibility of a transfer because of his "inability to perform worklines etc."  Defs.' Ex. A, PO639.  On April 28, 2004, Nurse Sarah Linfoot suggested to him the possibility of doing janitorial tasks, but noted "Inmate not responsive to suggestion."  *Id.*  PO636.  On that same day, Kane apparently submitted a medical request form claiming that sweeping and mopping are the most difficult work, although he inexplicably then requested to work as a dorm janitor.  That request was, understandably, denied.  The next day, Linfoot discussed Kane's medical status, and his inability to work, with Dr. Bauman.  Dr. Bauman apparently decided that Kane was inappropriate for housing at the Kulani work camp facility, and authorized his transfer.

Kane does not meet his burden of showing that he was transferred from Kulani due to Perez's threat, rather than because he was unable to meet the standards required to remain at Kulani.  *See Poland v. Chertoff*, Nos. 05-35508 & 05-35779, Slip Op. at 8832 (9th Cir. July 20, 2007) (in an Age Employment Discrimination in Employment Act retaliation case, holding that "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an

26

independent decision maker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or the decisionmaking process."). Kane has not met this standard.

It is undisputed that Kulani is a work camp. In order to remain there, inmates must be able to perform the work they are assigned. Kane's medical records show that, despite his initial placement there without workline restrictions, he was unable to perform any work from December 2003 until his transfer to HCF in May 2004. Thus, Kane was unable to perform any meaningful work at Kulani within weeks of being transferred there until the date he was transferred back to HCF. For a prison to maintain order and the perception of fairness to all inmates, an inmate who is unable to meet the qualifications required for housing at a work camp cannot be allowed to remain there. To allow Kane to remain at Kulani when he is unable to work imposes a burden on the prison, as well as on the other prisoners who are willing and able to work but must await a space.

Further, Kane's conclusory assertions that Perez threatened him with transfer are insufficient to link Perez's alleged threats with Kane's eventual transfer a month and a half later. The record is devoid of evidence showing that

Perez, or her alleged threats, had anything to do with Kane's transfer. Perez also states that she does not have the authority to authorize, or direct, an inmate's transfer and Kane does not counter this with competent evidence showing otherwise. Kane has failed to show any causal link between Perez's alleged retaliatory threats of transfer, and his transfer in fact. Nor does he counter the inescapable conclusion that, because he was unfit to remain at Kulani work camp, a legitimate penological concern precipitated his transfer, not a retaliatory motive. There is no genuine issue of material fact concerning Kane's transfer from Kulani. Summary judgment is GRANTED with respect to Kane's claims against Perez for retaliation.

## C.   Kane's Claims for "Terroristic Threatening"

Kane also says that Perez terroristically threatened him with retaliation and attempts to set forth a state law claim on this basis. There is no private cause of action for terroristic threatening. *See* H.R.S. § 707-715 *et seq*. As such, Kane has failed to state a claim and summary judgment is GRANTED as to this claim.

## D.   Kane's State Law Negligence Claims

Kane makes blanket assertions that Defendants' "failure to provide any further follow-up examination and treatment for [his] serious neck, shoulders,

28

and back and physical therapy for [his] neck, shoulders and back constitutes the torts of negligence under the law of the State of Hawaii." Compl. 9. Defendants argue that, because Kane has failed to identify any expert witness, he has failed to meet his burden of proof of establishing negligence or medical malpractice under Hawaii law. This court agrees.

Under Hawaii law, it is well settled that in medical malpractice actions, the question of negligence must generally be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony. *Craft v. Peebles*, 893 P.2d 138, 149 (Haw. 1995) (*citing Nishi v. Hartwell*, 473 P.2d 116, 121 (1970) (further citations omitted); *Carr v. Strode*, 904 P.2d 489 (Haw. 1995) (same). The plaintiff must also produce medical testimony showing that the applicable standard of care was breached. *Craft*, 893 P.2d at 149. This standard of care "must be established by expert testimony because 'a jury generally lacks the 'requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert .'" *Id. (quoting Rosenberg v. Cahill*, 99 N.J. 318, 325, 492 A.2d 371, 374 (1985) (citations omitted). Although certain exceptions apply to this rule, none is present here. See *Craft*, 893 P.2d at 298-301. Further, a plaintiff is required to provide expert medical testimony regarding the

29

standard of care to defeat a motion for summary judgment. *Id*.

The deadline for Kane to disclose his expert witnesses and to submit his Rule 26 expert witness reports was December 12, 2006. Kane has not identified any expert witnesses he intends to call, nor has he submitted any expert witness declaration or report establishing his claims of negligence. The discovery deadline was extended at Kane's request despite indications that Kane was willfully misrepresenting Defendants' actions with respect to discovery disputes. Nonetheless, Kane did not move to include expert witnesses prior to the new cutoff date. At the final pretrial conference, held on July 5, 2007, Kane did not identify any expert witness that he intended to call. As such, Kane's claim for medical malpractice based on Defendants' negligence must be dismissed. Summary judgment is GRANTED with respect to Kane's negligence claims.

## IV.  CONCLUSION

1.    Summary judgment is GRANTED IN PART AND DENIED IN PART as follows:

2.    Summary judgment is GRANTED with respect to all claims (a) against Dr. Saldana; (b) generally alleging deliberate indifference to Kane's medical needs against Perez, excepting those claims stemming from Perez's order to Kane to return to work on March 12, 2003; and (c) against all Defendants

30

alleging retaliation, terroristic threatening, and negligence.

      3.    Summary judgment is DENIED with respect to Kane's claims against Perez, alleging that she ordered him to work on March 12, 2003, with deliberate indifference to his serious medical needs.

      IT IS SO ORDERED.

      DATED:  Honolulu, Hawaii, July 20, 2007.



                  /s/ J. Michael Seabright
                  J. Michael Seabright
                  United States District Judge

*Kane v. State of Hawaii, et al.*, Civ. No. 06-00055 JMS/KSC; Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; dmp\ Orders 07\Kane 06-55 (MSJ)